## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,      )
                                  )
        Plaintiff,             )
                                  )
v.                                   )         Case No. 21-cr-00359-GKF
                                  )
ANDRE KEVIN HARRIS,         )
                                  )
        Defendant.         )

## OPINION AND ORDER

Before the Court is the Government's motion to determine whether Defendant Andre Kevin Harris should receive involuntary medication to restore his competency. The Court finds the Government has not met its burden of showing that medication is substantially likely to render Mr. Harris competent, and the request to medicate Mr. Harris is denied.[1]

## BACKGROUND

The Court provides the following background, balancing the public importance of the issues at stake in this decision with the need to avoid unnecessary detail regarding Mr. Harris's private medical issues.

---

[1] Courts have found that "an order authorizing involuntary medication is dispositive of a claim or defense of a party, and therefore . . . it is not among the pretrial matters that can be fully delegated to the magistrate judge under [28 U.S.C.] § 636(b)(1)(A)." *United States v. Rivera-Guerrero*, 377 F.3d 1064, 1069 (9th Cir. 2004); *cf. United States v. Morrison*, 415 F.3d 1180, 1185 (10th Cir. 2005) (noting this authority but not addressing the issue). Here, the undersigned does not authorize such dispositive relief. Because a magistrate judge's authority is determined by the relief imposed, rather than the relief sought, the Government's motion will be denied by an order, rather than a report and recommendation to District Judge Gregory K. Frizzell. *Cf. Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519-20 (10th Cir. 1995) (noting in civil context, "Even though a movant requests a sanction that would be dispositive, if the magistrate judge does not impose a dispositive sanction the order falls under [Fed. R. Civ. P.] 72(a) rather than Rule 72(b).").

### *The Charges*

This case is fast approaching its third anniversary.  On July 27, 2021, a magistrate judge issued a warrant for the arrest of Defendant Andre Kevin Harris.  (ECF No. 2.) According to the complaint, a day earlier, Mr. Harris allegedly entered the bedroom where his then-wife, S.H., was folding sheets, put a gun to his own head, and told her he would pull the trigger if she did not tell him the truth.  (ECF No. 1 at 5.[2])  Mr. Harris believed "people were out to get him," told S.H. he would shoot her dog, and left the room.  (*Id.*) After S.H. ran from the house, Mr. Harris followed and shot at her multiple times, striking her once in the leg or foot.  (*Id.* at 3, 5.)  When Rogers County Sheriff's Deputy Christopher Houston arrived, he saw Mr. Harris holding a gun in his hand and standing over S.H.  (*Id.* at 4.)  As Deputy Houston continued to approach, with his emergency lights activated, Harris fired two shots at Houston's vehicle then ran away and was ultimately arrested. (*Id.* at 3-4.)

The grand jury indicted Mr. Harris on August 17, 2021, charging him with two counts of assault with a dangerous weapon with intent to do bodily harm and discharging a firearm during and in relation to a crime of violence—one count of each offense for victim S.H. and Deputy Houston.  (ECF No. 16.)  The grand jury also charged Harris with being a felon in possession of a firearm.  (*Id.*)  Mr. Harris faces up to 10 years imprisonment for the assault and possession charges.  *See* 18 U.S.C. § 113(a)(3); 18 U.S.C. § 924(a)(2) (2021).[3]  He also faces a minimum of 10 years for each count of discharging a

---

[2] Citations to page numbers refers to the ECF header and not any internal numbering.

[3] In 2021, § 924(a)(2) provided a ten-year maximum penalty for anyone who knowingly violated 18 U.S.C. § 922(g).  This penalty has since increased to 15 years for later-committed offenses.  *See* Stop Illegal Trafficking in Firearms Act, Pub. L. No. 117-159, Sec. 12004(c) (amending at 18 U.S.C. § 924(a)(8)) (June 25, 2022).

firearm, to be served consecutively, for a total minimum of 20 years.  *See* 18 U.S.C. § 924(c)(1)(A)(iii), (D)(ii).

### Initial Competency Exam

On November 18, 2021, Defendant's counsel moved for an examination of Mr. Harris to determine his competency.  (ECF No. 33.)  Following an initial hearing, on December 16, 2021, the Court determined there was reasonable cause to believe that Mr. Harris may be suffering from a mental disease or defect rendering him incompetent, set the matter for a competency hearing, and ordered a psychiatric or psychological examination under 18 U.S.C. § 4241(b).  (ECF No. 40.)

Mr. Harris was evaluated at the Federal Medical Center in Fort Worth, Texas, from March 9, 2022, through April 8, 2022, by Samuel Browning, Ph. D.  (ECF No. 49 at 2.) Dr. Browning completed his report on May 17, 2022, diagnosing Mr. Harris with "unspecified schizophrenia spectrum and other psychotic disorder" and finding that he was not competent to proceed.[4]  (*Id*. at 8-11.)  Dr. Browning noted that Mr. Harris made statements that appeared to be consistent with thought disorder, including attributing a 2018 motorcycle accident to a law enforcement officer attempting to kill him and steal his properties; a belief that the local sheriff's office was trying to kill him, because he learned they had murdered his brother; a belief that the hospital had removed or attempted to remove his spleen and/or kidneys and may have been attempting to harvest organs for

---

[4] According to Dr. Browning, the "unspecified" diagnosis "applies to presentations in which symptoms characteristic[] of a schizophrenia spectrum and other psychotic disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate, but do not meet the full criteria for any of the disorders in the schizophrenia spectrum and other psychotic disorders class." (*Id*. at 8.)  This diagnosis "includes presentations in which there is insufficient information to make a more specific diagnosis," such as when there are limited mental health records—which was the case for Harris.  (*Id*.)

the black market; and discussing evidence that his civil attorney was attempting to take his settlement money.  (*Id.* at 6.)  As it affected his competency, Dr. Browning noted that Defendant believed his criminal case was tied to his civil matter and would not consider a plea agreement, as he intended to expose the truth regarding the local sheriff office's persecution of and attempts to harm him.  (*Id.* at 9-10.)  These beliefs impacted both his ability to understand the proceedings against him and to assist in his defense.  (*Id.*)  Dr. Browning concluded that additional information would be necessary to increase diagnostic accuracy, but he was confident that Mr. Harris's symptoms had caused him "to conceptualize his criminal case on the basis of a delusion and to think through his decisions within this non-reality-based framework."  (*Id.* at 10.)  Finally, Dr. Browning concluded that Mr. Harris's prognosis was guarded but it was hoped that treatment with psychotropic medications might improve his symptoms.  (*Id.* at 10-11.)

The Court called the matter for a competency hearing on May 20, 2022, but Defendant requested and was granted an evidentiary hearing that was then held on July 19, 2022.  (ECF Nos. 51, 53.)  At the hearing Dr. Browning testified and was examined by the parties.  (ECF No. 53.)  Defendant also presented news reports relating to Eric Harris, who appears to be Defendant's brother, and who was killed by a Tulsa County reserve deputy in 2015, as well as the $6 million settlement of a related civil lawsuit.[5]  (ECF No. 53 at 1-2.)  Following the hearing the Court determined, by a preponderance of the evidence, that Defendant Harris was incompetent and committed him to the custody of the Attorney General to determine whether there was a substantial probability that, in the foreseeable future, he would attain the capacity to permit the proceedings to go forward.

---

[5] *See also* Agreed Judgment, *Burke v. Regalado*, No. 16-cv-7-JED-FHM (N.D. Okla. Mar. 12, 2018).

(ECF No. 54.)  Defendant then entered the very long waitlist for a bed at an appropriate medical facility.

### *Initial Restoration Period*

Mr. Harris arrived at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri, on September 14, 2023, and was evaluated during the four-month period ending January 12, 2024.  (ECF No. 69 at 2.)  On January 17, 2024, Sarah L. Burton, Ph. D., issued her report.  (*Id.*)  Dr. Burton outlined the background information she reviewed, including Harris's self-reported history, investigative materials, court filings, the prior evaluation, and evaluations and observations that occurred at the Springfield facility.  (*Id.* at 3-13.)  The report provided additional details regarding Harris's belief that his wife had been poisoning him, that hospital staff were working with his wife and civil attorney to harm him and steal his civil settlement, and that law enforcement were trying to get back at him.  (*Id.* at 8-9, 11-14.)

Dr. Burton then diagnosed Harris with "Delusional Disorder, Persecutory Type." (*Id.* at 14.)  Dr. Burton later explained her belief that Dr. Browning's prior diagnosis of "unspecified schizophrenia spectrum and other psychotic disorder" resulted from a lack of collateral records; that during her lengthy period of observation, she did not observe any evidence that Mr. Harris was suffering from schizophrenia or schizoaffective disorder (such as hallucinations or disorganization); and that his primary symptoms best fit the diagnosis of delusional disorder.  (ECF No. 83 at 32:1-33:12.)  Dr. Burton found that Harris's symptom presentation remained "consistent and chronic" during his time at the facility.  (ECF No. 69 at 15.)  While Harris had good factual knowledge of the legal system, his delusions rendered him irrational in applying that factual knowledge to his own legal situation and hindered his ability to assist properly in his defense.  (*Id.* at 15-16.)

Dr. Burton opined that Harris was not competent to proceed and was substantially unlikely to be restored to competency without the antipsychotic medication he was refusing to take. (*Id*. at 16.) However, with the proper prescription and monitoring of antipsychotic medication, Dr. Burton believed it was substantially likely that Harris could be restored to competency in the foreseeable future, and Dr. Burton offered additional opinions relating to Harris's suitability for involuntary medication. (*Id*. at 17-18.)

### *The Motion for Involuntary Medication*

Following a status hearing, the Government filed the current motion, asking the Court for a hearing to determine whether Harris should receive involuntary medication to restore his competency under *Sell v. United States*, 539 U.S. 166 (2003). (ECF No. 72.) Defendant objected to forcible medication but agreed a hearing was appropriate. (ECF No. 75.) The Government filed a proposed treatment plan prepared by Shawn Rice, M.D. (ECF No. 78-2), and the Court held an evidentiary hearing on April 18, 2024 (ECF Nos. 81, 83).

At that hearing, the Court heard testimony from Drs. Burton and Rice as witnesses for the Government, and William Enochs, M.D., as witness for Defendant.[6] (*Id*.) The Government's exhibits consisted of (1) the forensic report of Dr. Burton (ECF No. 69); (2) the proposed treatment plan of Dr. Rice (ECF No. 78-2); and (3) a scholarly article—Robert E. Cochrane, et al., *The* Sell *Effect: Involuntary Medication Treatment is a 'Clear*

---

[6] No party has questioned the qualifications or ability of these witnesses to offer expert opinions under Fed. R. Evid. 702.

*and Convincing' Success*, 37 L. & Hum. Behav. 107 (2013).[7]  Defendant's exhibit consisted of (1) the curriculum vitae of Dr. Enochs.

For the most part, Drs. Burton and Rice testified consistently with their respective report or plan.  And, for the most part, there was no dispute between the various witnesses regarding certain essential facts, including that (1) Defendant suffers from delusional disorder, persecutory type; (2) Defendant is currently not competent; (3) Defendant is not likely to regain competency without medication; and (4) Defendant will not voluntarily consent to medication.  A dispute arose, however, regarding whether medication is substantially likely to render Defendant competent—specifically, whether the medication is effective for persons with Defendant's particular diagnosis of delusional disorder.  (*See, e.g.,* ECF No. 83 at 20:11-21:24 (diagnosis); 25:14-22, 26:25-27:3, 27:19-22, 28:24-29:14 (Dr. Burton's opinion); 59:10-21, 60:22-61:3, 67:20-68:4, 81:5-9, 105:19-106:4 (Dr. Rice's opinion); 99:17-100:8, 100:18-101:8, 102:18-103:25 (Dr. Enochs' opinion).)

The parties were given the opportunity to submit additional briefing after the hearing but did not do so.  This matter is now ripe for decision.

## ANALYSIS

### I.  The *Sell* Standard

Individuals have "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs . . . ."  *Washington v. Harper*, 494 U.S. 210, 221-22

---

[7] The article was originally published online on July 2, 2012.  *Id.* at 107 n.a1.  The version presented at the hearing has a different pagination than in the journal citation above, which is available on Westlaw.  For ease of review, this order will cite the journal pagination, which is 106 pages higher than that referenced at the hearing.  (For example, page 1 in the hearing transcript refers to page 107 of the journal article; page 2 refers to page 108; and so forth.)

(1990).  This constitutionally protected liberty interest can only be overcome by an "essential or overriding state interest."  *Sell v. United States*, 539 U.S. 166, 178-79 (2003) (quoting *Riggins v. Nevada*, 504 U.S. 127, 134-35 (1992)) (internal quotation marks omitted).

In *Sell*, the Supreme Court found the Constitution permits the Government to administer antipsychotic drugs, against a defendant's will, to restore his competency— but only in limited circumstances where certain conditions were satisfied.  *Id.* at 169.  Such involuntary administration of drugs to obtain competence is only allowed when (1) "*important* governmental interests are at stake"; (2) "involuntary medication will *significantly further* those" state interests—that is, "administration of the drugs is substantially likely to render the defendant competent" and "is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense"; (3) "involuntary medication is *necessary* to further those interests"—that is, "any alternative, less intrusive treatments are unlikely to achieve substantially the same results" and less intrusive means (such as a court order backed by contempt power) have already been considered; and (4) the "administration of such drugs is *medically appropriate*"—that is, "in the patient's best medical interest in light of his medical condition," taking into account side effects and effectiveness.  *Id.* at 179-81.  When stating this test, the Supreme Court anticipated that instances of involuntary medication "may be rare."  *Id.* at 180; *see also United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1223 (10th Cir. 2007) (citing *Sell* and stating that "instances of involuntary medication of a non-dangerous defendant solely to render him competent to stand trial should be 'rare' and occur only in 'limited circumstances.'").

The Government bears the burden of proving, by clear and convincing evidence, any factual findings required by the *Sell* test.  *United States v. Bradley*, 417 F.3d 1107, 1114 (10th Cir. 2005).[8]

## II.     Applying the Standard

The Court will address each required standard but leaves the second requirement for last.  As noted below, the Court finds the Government has an important interest; that involuntary medication (if it were appropriate) would be necessary to achieve that interest; and that the administration of the recommended medications would be medically appropriate.  The Court finds, however, that involuntary medication will not significantly further important governmental interests, because the Government has not shown—by clear and convincing evidence—that the medication is substantially likely to render Harris competent.

### A.     Importance of Governmental Interests

The Court finds "*important* governmental interests are at stake" in this case.  *Sell*, 539 U.S. at 180.  "[T]he government has an important interest in prosecuting defendants for serious crimes with which they are charged and in ensuring their mental competence for the duration of their prosecutions."  *Valenzuela-Puentes*, 479 F.3d at 1226 ("going ahead with a criminal trial 'with a certifiedly delusional defendant advancing a possibly

---

[8] *Bradley* is often cited for the proposition that the first two requirements are legal questions, while the last two are factual questions—for which the clear-and-convincing standard applies.  *See, e.g., Valenzuela-Puentes*, 479 F.3d at 1224.  However, *Bradley* itself (and citing authorities) make it clear that the second requirement—as stated above— includes factual findings that, themselves, must be found by clear and convincing evidence.  *See Bradley*, 417 F.3d at 1114 (merging the "substantially likely to render the defendant competent" test into a discussion of the fourth requirement); *Valenzuela-Puentes*, 479 F.3d at 1227 (considering the "substantially likely" test under the second requirement but still requiring clear and convincing evidence).

delusional defense [ ] is not an option in our system.'") (quoting *United States v. Gomes*, 387 F.3d 157, 162 (2d Cir. 2004)).  "Whether a crime is 'serious' relates to the possible penalty the defendant faces if convicted, as well as the nature or effect of the underlying conduct for which he was charged."  *Id.* (finding a maximum sentence of 20 years with a guidelines range of 6-to-8 years to be serious).

Here, the crimes are serious.  Defendant is facing a minimum of 20 years imprisonment for crimes that include the discharge of a firearm resulting in injury to another.  (*Supra* at 2-3.)  And, as the Government outlined at the hearing, the alleged circumstances of the shooting—including discharging a firearm in a residential neighborhood—only add to the seriousness of the alleged offense.  (ECF No. 83 at 115:17-119:3.)

The Court further finds there are no special circumstances that lessen the importance of the Government's interest.  *See, e.g., Sell*, 539 U.S. at 180.  The Court cannot assume, at this time, that Defendant necessarily will face lengthy civil commitment or other future confinement, and Defendant's current incarceration of nearly three years is not nearing the amount of time he would likely serve if convicted of the offenses charged.  The Court is not aware of any other special circumstances that could be implicated in this case.

### B.    Necessity

The Court concludes that—if it were otherwise appropriate—"involuntary medication is *necessary* to further" the important governmental interests.  *Sell*, 539 U.S. at 181.  To make this decision, the Court "must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results."  *Id.*  This step also includes considering whether less intrusive methods—like a court order backed by the

contempt power—will work before considering more intrusive methods. *Id.* It also includes considering whether medication is warranted for a different purpose such as to avoid dangerousness while incarcerated under *Harper*. *See United States v. Morrison*, 415 F.3d 1180, 1186 (10th Cir. 2005) ("the *Harper* inquiry should have preceded the *Sell* inquiry (or at least the Government should have explained why it did not pursue a *Harper* inquiry[)]"). *But cf. Valenzuela-Puentes*, 479 F.3d at 1224 (*Harper* inquiry unnecessary where no evidence the defendant might present a danger to himself or others).

Dr. Burton testified that no less intrusive treatments are available. (ECF No. 83 at 27:4-13.) Less intrusive <u>means</u> also are unavailable. Here, Harris has been consistent and resolute in his refusal of medication before the period leading up to Dr. Burton's January 2024 report and after. (ECF No. 69 at 10-11; ECF No. 83 18:18-20, 33:13-17, 35:10-36:3, 36:24-38:8.) Further, under the treatment plan proposed by Dr. Rice, the first step would be to inform Harris that there was a court order for his medication and offer him the opportunity to cooperate in his treatment plan.[9] (ECF No. 78-2 at 2.)

Moreover, a *Harper*-type inquiry has already occurred, as the administrative hearing officer determined that Mr. Harris did not then meet the criteria of being gravely disabled, a significant danger to himself, or a significant danger to others in a correctional

---

[9] Defendant's counsel could not definitively state that Harris would refuse to take medication if ordered by the Court. Given the inherently coercive nature of an order to take medication or face contempt of court, the Court finds that it is not appropriate to order a defendant like Mr. Harris to take antipsychotic medications when the Government has not otherwise met its burden of demonstrating that such medications are substantially likely to restore his competency. If the other bases for involuntary medication had been met in this case, the Court would consider the necessity standard met by a tiered-order process that <u>started</u> with an order from the Court that Mr. Harris submit to the recommended medication and, only failing that, proceeded with more coercive means.

environment.  (ECF No. 69 at 11; *see also* ECF No. 83 at 121:22-122:12 (defense counsel agrees this BOP process approximates the required test).)

As such, the Government has met its burden of showing that the involuntary administration of medication would be necessary, were it otherwise appropriate under the *Sell* test.

### C.      Medical Appropriateness

The Court also concludes that the "administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition," *Sell*, 539 U.S. at 181—or at least that it would be if it was substantially likely to render him competent.  Both sides' witnesses agreed that the off-label use of antipsychotics in this manner would be an acceptable route of treatment to attempt with a willing patient.  (*See, e.g.,* ECF No. 83 at 27:23-28:2; 100:25-101:7.)  The Court finds this conclusion stands even when taking into account the potential side effects—and even considering that, if Mr. Harris persists in refusing to comply—Haldol would be the only available medication. While some of the side effects noted are severe, their odds are low.  (ECF No. 83 at 80:11-81:4.)  *See also* Cochrane, et al., *The Sell Effect*, 37 L. & Hum. Behav. at 111 (discussing the side effects observed in that study).

### D.      Significantly Furthering the Government's Interests

The Court does <u>not</u> "conclude that involuntary medication will *significantly further*" the Government's important interests.  *Sell*, 539 U.S. at 181.  This requirement has two parts.  First, the Court "must find that administration of the drugs is substantially likely to render the defendant competent to stand trial."  *Id.*  Second, the Court "must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial

defense, thereby rendering the trial unfair." *Id*.  "[O]nly in the event the district court determines that the government has proved these two factors by clear and convincing evidence may it conclude that involuntary medication will *significantly further* the government's interest." *Valenzuela-Puentes*, 479 F.3d at 1228.  The Government has met its burden as the latter, but not the former.

### 1.   Substantial Likelihood of Side Effects Rendering Trial Unfair

As for side effects, both Drs. Rice and Enochs presented evidence on the potential specific side effects of the various medication options proposed by Dr. Rice.  (ECF No. 83 at 49:23-51:21, 80:11-81:4, 94:10-98:9.)  Depending on the medication, these side effects were primarily metabolic (weight gain, diabetes, etc.) or neuromuscular (tardive dyskinesia, neuroleptic malignant syndrome, etc.).  From the evidence presented, the Court finds no indication that these side effects, if they occurred and were not managed through medication changes or otherwise, would significantly interfere with Defendant's ability to assist his attorney.

### 2.   Substantial Likelihood of Restoration to Competency

The Government's evidence was lacking on the likelihood that the medications would restore Defendant's competency.  Dr. Enochs testified that it is a "fallacy of logic" to assume that delusional disorder has the same etiology or response to medication as schizophrenia, simply because it is classified as a "psychotic disorder" in Diagnostic and Statistical Manual of Mental Disorders ("DSM").  (ECF No. 83 at 103:16-25.)  Both Dr. Enochs and Dr. Rice testified to a study that concluded only 32% of individuals with

delusional disorder responded to antipsychotic medication.[10]  (ECF No. 83 at 63:21-24 (Dr. Rice), 103:7-12 (Dr. Enochs).)  Dr. Rice also referenced an earlier study that found no favorable outcomes from antipsychotics for persons with delusional disorder.[11]  (*Id.* at 63:13-20.)  Meanwhile, Dr. Enochs testified to a "conventional wisdom" that "delusional disorder does not respond well to antipsychotics" (*id.* at 100:13-14, 103:8-9), but he also testified to the lack of any good data either way (*id.* at 100:16-24).  Dr. Enochs did not dispute that antipsychotics "might very well work" or that it would be reasonable to try them with a patient who consented to treatment and was willing to accept the side effects. (*Id.* at 100:25-101:7.)  He simply opined that they were not substantially likely to restore Harris to competency.  (100:5-8.)

Drs. Rice and Burton opined involuntary medication <u>was</u> substantially likely to result in restoration.  In forming their opinions, the Government witnesses relied heavily on a 2012 study of persons involuntarily medicated in the federal system from June 2003 to December 2009— Cochrane, et al., *The Sell Effect*, 37 L. & Hum. Behav. at 108.  (ECF No. 83 at 25:18-22, 38:16-39:1 (Dr. Burton); 60:22-61:3, 62:15-63:12, 63:25-64:11 (Dr. Rice).)  That review was particularly focused on "whether administration of antipsychotic

---

[10] The witnesses appear to be referring to José Eduardo Muñoz-Negro, et al., *A Systematic Review of Studies with Clinician-Rated Scales on the Pharmacological Treatment of Delusional Disorder*, Int'l Clinical Psychopharmacology, vol. 35, no. 3, 129 (May 1, 2020), abstract only available at https://pubmed.ncbi.nlm.nih.gov/32097136/ (last visited May 29, 2024). "Overall, this review included a total of 437 patients on [antipsychotics] treatment . . . .  In general, 32.3% of patients showed a good response to treatment with [antipsychotics]." *Id.* at 133.

[11] More accurately, Dr. Rice appeared to be citing an article that referenced both this study and the Muñoz-Negro review.  *See* Alexandre González-Rodríguez, et al., *Seventy Years of Treating Delusional Disorder with Antipsychotics: A Historical Perspective*, Biomedicines, vol. 10, issue 12 (Dec. 18, 2022), available at https://www.mdpi.com/2227-9059/10/12/3281 (last visited May 29, 2024).

medication to nondangerous individuals on an *involuntary* basis for restoration purposes would result in similar outcomes" as published data on treatment effectiveness of antipsychotic medication for those diagnosed with schizophrenia and other psychotic disorders (and related restoration studies). Cochrane, et al., *The Sell Effect*, 37 L. & Hum. Behav. at 108. During the six-year period studied, 287 requests were made to federal courts to authorize involuntary medication; 133 of those requests were granted; and 132 were ultimately treated. *Id.* at 109, 111. Of those treated, the clinicians determined that 104, or 78.8%, were restored to competency, with an average treatment time of 144.41 days. *Id.* at 112-13. A majority of those treated were restored within a single 120-day period. *Id.* at 115.

The study categorized the participants by one of four primary diagnoses: (1) schizophrenia; (2) schizoaffective disorder; (3) delusional disorder; and (4) psychotic disorder, NOS [not otherwise specified]. *Id.* at 109. The majority of those studied were primarily diagnosed with schizophrenia or schizoaffective disorder. *Id.* at 113. For delusional disorder, requests for involuntary medication were made in 44 cases, 34% of those requests were granted, and the study population included only 15 such individuals. *Id.* at 109. Of those individuals, 11 (or 73.3%) were restored to competency. *Id.* at 113. When discussing the strengths and limitations of their study, the authors noted this small sample size and recommended that "future research should focus on treatment effectiveness for these rarer disorders."[12] *Id.* at 115. Dr. Rice acknowledged that this was a small sample size (ECF No. 83 at 83:13-19), but he offered no opinions on the potential

---

[12] The authors also noted that the nature of a retrospective document review meant that "the opinions of the examiners may have been biased in favor of finding a positive response to treatment," although they found this offset, to a degree, by independent judicial review. *Id.* at 114.

effect of that sample size (other than those implicitly found in his reliance on the study).
Dr. Enochs opined that no reliable conclusions could be drawn from a sample size that
small.  (*Id.* at 99:21-100:2.)

Drs. Rice and Burton also cited their experience as another basis for their opinions
on the likelihood of restoration.  However, neither was able to articulate any evidence
specific to individuals with delusional disorder, as opposed to persons with schizophrenia
or psychotic disorders in general.  (ECF No. 83 at 40:11-17 (Dr. Burton).)  For example,
Dr. Rice testified,

> A.      . . . I still stand by my experience working at the prison for 18 years,
> working with Care Level 4 mental health individuals being in a building of
> about 200 or more patients, 74 of which are involuntarily medicated at this
> point.  And looking at the response rates, I still stand by my report, and I
> disagree with Dr. Enochs.
>
> . . .
>
> Q.      And I think you said you oversee 74, currently, patients on
> involuntary medicine?
>
> A.      Yes. . . .
>
> . . . Now, once again, these are primarily - - the research goes towards
> schizophrenia.  Delusional disorder is rare.
>
> . . .
>
> But I want the Court to know too that I stand by my report.  I believe there
> is a substantial probability that [Mr. Harris] will be restored.  The delusional
> disorder - - once again, there is no FDA-approved medication for it.  There
> is - - there is limited data on it.
>
> . . .
>
> But the main thing for the Court and Your Honor, because of the absence of
> robust - - robust evidence 70 years after the introduction of antipsychotic
> treatment, guidelines for optimal management of delusional disorder are
> not yet available.
>
> And I believe one of the - - forgive me.  I believe one of the - - in that article
> with Cochrane, one of the limitations of the study was the - - the number. . . .

But, once again, I still stand by my report and my recommendation and treatment plan. But it's not like the studies, like, for schizophrenia. But it's still a class of disorders that's treated with antipsychotics, and I don't know how else to answer.

. . .

Q.   . . .  As proposed in your treatment plan, have you had success treating inmates with delusional order as you suggest?

A.      We've had - - let me answer I don't exactly know the numbers of delusional disorder specifically, so I can't specifically answer the question about the specific diagnosis of delusional disorder.

Quite frequently, we have patients with delusions that the delusions with antipsychotic medication are reduced to the point that the individual is able to meaningfully participate in treatment and make forward progress towards their treatment goals, which in many cases would be a committed individual . . . being able to have their psychosis treated, including delusions, to the point that they get well enough that they're recommended for conditional release. . . .

I can't answer exactly the numbers of the delusional disorder. I would have to look that up.

Q.      But you've had enough success in your past with a similar treatment plan for delusional disorder to be able to render an opinion that you believe there is a substantial likelihood that [Mr. Harris] would be restored to competency, as you suggest?

A.      Yes. Based upon our psychotic population here and based on the Cochrane study and treating people with the same type of problems as the delusions. I don't have a number on the delusional disorder, specifically that.

. . .

Q.      Okay. And how confident are you in your opinion that your plan will be successful and that there's a substantial likelihood that Mr. Harris will be restored to competency?

A.      In that study, it's 79 percent. In other literature that I've looked at, which I can't recall the names, but in the forensic literature, I would say 70 percent.

Q.      Okay.

A.      Given - - especially given the fact that he's not been on medication before, and there's a good chance that he'll be over in the people that respond to the trial and - - of a medication the first time, that there's a - - or with an individual in the psychotic schizophrenia spectrum disorders, there is a - - like, a four-out-of-five chance that they'll respond to the medication based off of the literature on schizophrenia, which is well-studied, much-better studied.

(ECF No. 83 at 107:14-113:17.)

Neither Dr. Rice nor Dr. Burton offered any testimony or evidence explaining why it would be appropriate to extrapolate results seen in schizophrenic patients (or psychotic patients generally) to those with delusional disorder—other than their reliance on the Cochrane study.  Neither witness, for example, discussed the mechanics of how delusional disorder develops as compared to other psychotic disorders, like schizophrenia; how antipsychotic drugs work physiologically to address the varied symptoms of schizophrenia, delusional disorder, or other psychotic disorders; or otherwise explain their decision.  Neither witness explained why it was appropriate to disregard a review of studies that found only 32% of delusional-disorder patients had a good response to anti-psychotics in favor of a retrospective document review with a small sample size that found 73% of delusional-disorder inmates restored to competency.[13]

The Government must show by clear and convincing evidence that the administration of drugs is substantially likely to render the defendant competent to stand

---

[13] Dr. Burton did opine that, with a consistent period of medication, Defendant "would present in a manner where he would be more willing to consider alternative perspectives and theories related to his beliefs," which would result in a substantial probability that he would be restored to competency.  (ECF No. 83 at 28:24-29:10.)  And, Dr. Rice carefully noted the difference between competency restoration and a cure.  (*Id.* at 64:12-21.)  However, the witnesses did not assert there was a distinction between being responsive to medication and the potential for restoration to competency.  Dr. Rice, in fact, discussed getting "a response" from medication as part of the treatment to restore competency.  (*E.g., id.* at 106:6-11.)

trial.  *Valenzuela-Puentes*, 479 F.3d at 1228.  The Government establishes a fact by clear and convincing evidence only if the evidence "place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable,'" meaning the material offered "instantly tilted the evidentiary scales" in the Government's favor when weighed against the evidence offered in opposition.  *Id*. (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

Based on the current record, the Court cannot say this standard is met or that it is "clearly convinced that [Harris] could be rendered competent through medication despite his" delusional-disorder diagnosis.  *Id*. at 1229.

The Court finds that involuntary medication will not significantly further the Government's important interests.

## CONCLUSION

Were Mr. Harris in the community, a psychiatrist easily might recommend he try antipsychotics to treat his delusional disorder, and such medications might improve his symptoms sufficiently to restore his competency.  But, the Court is faced with a much weightier question.  Despite Mr. Harris's liberty interest, should the Court force him—through various and increasing means of physical coercion—to ingest medications that will alter the functioning of his brain, for the sole purpose of rendering him competent to stand trial?  The Supreme Court has said such a result can be constitutionally permissible, but only in limited circumstances and only if certain criteria are met.

Here, those criteria are not met.  The Government has failed to meet its burden of showing, by clear and convincing evidence, that the involuntary medication of Mr. Harris is substantially likely to result in his restoration to competency.  The Court cannot find

that involuntary medication will significantly further the Government's important interests.  The Court cannot order Mr. Harris's involuntary medication.

IT IS THEREFORE ORDERED that the request for involuntary medication contained in the *Motion for Hearing* (ECF No. 72) is DENIED.  The parties shall submit a joint status report to the Court by June 13, 2024, setting forth their positions on the next appropriate steps in this case.  Mr. Harris shall remain at the U.S. Medical Center for Federal Prisoners pending further order of the Court.

ORDERED this 30th day of May, 2024.

_____
SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT